ONEONTA DRESS CO., Inc., Edmeston Dress Co., Inc. and Sherwood Fashions, Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

Clodomiro ISOLINO, d/b/a under the trade name and style of Ravena Sportswear, Respondent.

Nos. 307 and 412,
Dockets 28344 and 28382.

United States Court of Appeals
Second Circuit.

Argued March 4, 1964.

Decided June 12, 1964.

Manes, Sturim & Laufer, New York City (Arthur M. Laufer, New York City, of counsel), for petitioners in No. 28344.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Harold B. Shore, Attys., N. L. R. B., for respondent in No. 28344 and for petitioner in No. 28382.

No appearance for respondent in No. 28382.

Before MOORE and FRIENDLY, Circuit Judges, and DIMOCK, District Judge.*

DIMOCK, District Judge.

By an order issued June 19, 1963 the National Labor Relations Board found that Oneonta Dress Co., Inc., Edmeston Dress Co., Inc., Sherwood Fashions, Inc. (hereinafter "Oneonta," "Edmeston" and "Sherwood," respectively, and "the petitioners," collectively) and Clodomiro Isolino, doing business as Ravena Sportswear (hereinafter "Ravena") had violated Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U. S.C. §§ 158(a) (1) and (3) (1958). The cases are before this court on petitions of Oneonta, Edmeston and Sherwood to review and set aside the Board order and of the Board to enforce its order against Isolino.

The cited subsections respectively brand it as an unfair labor practice for an employer to interfere with the right of employees to organization and, "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

The Board found that the termination of Ravena's finishing department was motivated by anti-union animus and hence violated subsections 8(a) (3) and (1). It also found that statements to and interrogation of employees and the discharge of two employees violated subsections 8(a) (1) and (3). It further found that Isolino and the petitioners constituted a single employer responsible for all of the unfair labor practices. The Board entered a cease and desist order and directed that certain affirmative action be taken including the reestablishment of the finishing department and the reinstatement of employees.

Except insofar as they relate to the closing of the finishing department, the Board's findings are supported by substantial evidence on the whole record. Accordingly, to that extent, the enforcement of the order will be granted. We view differently, however, the Board's treatment of the termination issue. Our consideration of it follows.

Sherwood is a manufacturer of dresses in New York City; it designs, produces and sells women's clothes. Oneonta is a contractor, producing dresses exclusively for Sherwood, at Oneonta, New York. Edmeston, a wholly owned subsidiary of Oneonta, located at Edmeston, New York, acted exclusively as subcontractor for Oneonta, until its plant was closed in December, 1961. John St. George, treasurer of Sherwood, has charge of its labor relations and its subcontracts among other matters. St. George, a 25% shareholder of Sherwood, is president and a 50% shareholder of Oneonta and is generally in charge of Oneonta's functions including labor relations. Lillian Creighton owns the plant in which Oneonta, as lessee, operates. In St. George's absence, she manages Oneonta's operations. In addition, Mrs. Creighton "trouble shoots" for Sherwood, training employees and supervising and inspecting quality and production of garments at Sherwood's subcontractors.

Clodomiro Isolino, who came to the United States from Argentina in 1959, entered into a tentative arrangement to purchase the Edmeston plant in the fall

---

* Sitting by designation.

of 1961. He made a down payment of $1,000 borrowed from an Amsterdam, New York, bank and commenced operations there. Shortly thereafter, however, a defective sewer required the closing of the Edmeston plant and the sale was rescinded. With St. George, Isolino negotiated for the acquisition of the facilities of Cousant, Inc., a blouse-manufacturing firm in Ravena, New York, which had ceased operations earlier in 1961. Negotiations between St. George, Isolino, Mrs. Evelyn Levy, owner of Cousant, and a representative of the New York Business Development Corporation, which held a mortgage on the Cousant plant, resulted in the lease of all of Cousant's property to Edmeston and Edmeston's assignment of its lease to Isolino. Edmeston paid the January, 1962 rent and remained liable as a signatory of the lease.

Mrs. Levy, Mrs. Creighton, St. George and Isolino assembled a work force, composed of former employees of Cousant, and Isolino began operations under the style "Ravena Sportswear" on January 22, 1962. Ravena acted as a subcontractor, producing dresses exclusively for Oneonta. A week after the plant opened, Sherwood, at its expense, arranged to have Ravena's employees covered by group accident and life insurance. Isolino invested an additional $3,000 in Ravena. Except for that, Ravena's operations have been supported wholly by advances, made by Oneonta, which in turn had received them from Sherwood. This, however, is common practice among manufacturers, contractors and subcontractors in the garment industry.

The operations begun by Ravena on January 22, 1963 consisted of the sewing or assembly of garments and involved employment of forty to fifty women. On February 6, 1962, Ravena opened a finishing department. Finishing involves the trimming, belting, and pressing of garments. Twelve women were employed in these activities.

Until Cousant, Inc. closed down, its employees had been represented by the International Ladies Garment Workers Union. Shortly after the opening of the Ravena finishing department, that union began activities to organize the plant. A number of employees, including ten in the finishing department, signed cards for the union.

On February 14, the finishing department was discontinued. There was testimony that Mrs. Creighton, in notifying a supervisor to inform the finishing department employees, made a comment to the effect that, "They are one hundred per cent for the union. To hell with them. I am going to let them go."

On the strength of this the Board concluded that it was Mrs. Creighton who decided on the shut down. Isolino was not permitted to give answers to questions which would have given information as to whether or not he had given the order for the discontinuance of the finishing department and whether or not he had done so for purely economic reasons. Passing the question of the propriety of the finding that the closing was to discourage union membership with the testimony of Mrs. Creighton's declaration standing unchallenged, it was error to make this finding on a record where the Trial Examiner had refused to admit testimony which might challenge that declaration.

With respect to Isolino's participation, the record discloses that when he was under direct examination the following took place:

"Q. Now, did there come a time, as you observed these things you have testified to, that you came to a decision as to whether or not you were going to continue operating the Finishing Department?

"Mr. Stanton: Objection.

"Trial Examiner: I will sustain it."

*By Mr. Ungerman:*

"Q. Did there come a time that you decided to dispense with the services of the Finishing Department?

"Mr. Stanton: Objection.

"Trial Examiner: I will sustain it."

4

"Q. Did you dispense with the services of the Finishing Department?

"Mr. Stanton: Objection.

"Trial Examiner: That may be answered.

"The Witness: I don't understand.

"Mr. Stanton: We have a stipulation on that."

*By Mr. Ungerman:*

"Q. Did you let the people from the Finishing Department go?

"Mr. Schlesinger: Objection. We have a stipulation in the record that they were let go.

"Trial Examiner: All right. This is repetitious of the stipulation.

"Mr. Ungerman: The question is whether he let them go. There has been testimony that, I think, could be interpreted otherwise.

"Trial Examiner: All right. This is to explain the stipulation.

"The Witness: When I send the girls home?

"Mr. Ungerman: Yes.

"The Witness: February 14.

"Mr. Stanton: Objection.

"Trial Examiner: Wait a minute.

"Mr. Stanton: I will withdraw that."

*By Mr. Ungerman:*

"Q. What method did you use to 'send the girls home'?

"Mr. Stanton: Objection.

"Trial Examiner: I will sustain that."

With respect to the position that Isolino had reason for dispensing with the operations of the finishing department different from anti-union bias, petitioner and Isolino sought to establish this position by showing that financial losses to Ravena and poor quality work by the finishing department motivated its closing and that the existence of union activity in the sewing department, which was not closed, comparable to that among the finishing employees, rebutted the contention that union affiliation had caused the closeout of the latter department. This attempt, however, was thwarted by rulings of the Trial Examiner. As they affected the cases of petitioners and Isolino, his interpretations of the rules of evidence were restrictive and often clearly wrong, contrasting sharply with the liberal treatment accorded General Counsel's case and the more relaxed view typically expected of administrative proceedings. The following examples are illustrative.

 Isolino was not permitted to testify to the losses suffered in Ravena's operations up to the date of closing the finishing department. Counsel's attempt was blocked by the inexplicable ruling that the records of the business would be the best evidence of cost. Mrs. Isolino was not permitted to testify to conversations with her husband indicating that business losses motivated the decision to terminate. The Trial Examiner excluded this evidence as hearsay, dismissing the state of mind exception as inapplicable, although Isolino's state of mind, his motivation, stood at the heart of the case, and his conversations were clearly admissible to show it. The position of Isolino and petitioners that finishing department work was of woefully bad quality was rejected as a fabrication. The Trial Examiner, however, sustained objections to questions directed to a principal General Counsel witness, Rose Schwalb, concerning a telephone call about the quality of work from Sherwood's production manager in New York to Ravena shortly before or after the decision to terminate. Evidence as to contemporaneous complaints about the quality of the finishing department work could have shown Isolino's concern with it, his state of mind, and rebutted General Counsel's contention that the claim of poor quality was a recent fabrication. On at least one of these grounds, the evidence was admissible and highly rele-

vant. The attempts to show union membership in the unclosed sewing department by subpoena of union records was thwarted, and counsel's attempt to show, through a witness, the identity and number of employees who had signed cards was blocked by the Trial Examiner, although similar inquiry by the General Counsel had been permitted.

The case of Darlington Manufacturing Co. v. N. L. R. B., 4 Cir., 325 F.2d 682, cert. granted Textile Workers of America v. Darlington Mfg. Co., 84 S.Ct. 1170, has been urged upon us by petitioners with the suggestion that the discontinuance of the finishing department did not, under its authority, constitute an unfair labor practice. The Darlington case involved the complete abandonment of an operation. The evidence here would not have been sufficient to support such a finding. We thus do not reach consideration of the propriety of following the Darlington decision.

In No. 28382, where the Board seeks enforcement of the order against Isolino, there has been no appearance for him. Nevertheless, rather than grant enforcement as against him of the order in its original form by default, we shall make the same disposition as in No. 28344.

We grant the petition to set aside the Board's order in part and grant the petitions for enforcement of the Board's order in part and we direct the enforcement of the order, modified accordingly as follows:

Strike out of clause 1(d) the expression "by shutting down departments at Ravena Sportswear."

Strike out of clause 2(a) all names but those of Carmella Cornwell and Carmela Morrell

Strike out all of clause 2(b).

Amend the form of notice required to be posted,

By striking out of the fourth announcing paragraph the words "by shutting down departments at Ravena Sportswear."

By striking out of the sixth announcing paragraph all names but those of Carmella Cornwell and Carmela Morrell.

By striking out all of the seventh announcing paragraph.

We remand the matter for a further hearing and new findings on the charge that the Ravena finishing department was shut down and the girls in that department discharged for discriminatory reasons.